Filed 7/28/23  In re M.R. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re M.R., a Person Coming Under Juvenile Court Law. | B325275 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.R., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP08147A) |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

## *INTRODUCTION*

This is the second time this case has come before us on appeal from termination of parental rights to daughter. We initially reversed the termination order, concluding the juvenile court erred in denying mother's request for a bonding study. (See *In re M.R.* (Oct. 28, 2021, B311061) [nonpub. opn.].) On remand, the juvenile court ordered and received a bonding study from a psychologist who observed mother and daughter together. The court also received more extensive analysis of the parent-child relationship from social workers and daughter's caregiver, who had monitored visitation.

The parents again appeal from termination of parental rights to daughter, asserting substantial evidence did not support the juvenile court's decision not to apply the parental-benefit exception to adoption set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] We affirm.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *Dependency Proceedings Prior to This Appeal[2]*

In December 2018, the Los Angeles Department of Children and Family Services (DCFS) detained then-seven-year-old

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

Father joins all of mother's arguments on appeal but does not make any of his own. Mother solely argues there was a beneficial parent-child relationship between mother and daughter.

[2] The following section is taken from the majority opinion in *In re M.R.* (Oct. 28, 2021, B311061) [nonpub. opn.]. We grant mother's request for judicial notice of that opinion. (Evid. Code, §§ 452, 459.)

daughter and her younger brothers (then ages three years and one month) from the parents due to severely unsanitary conditions in the family home. Daughter told the social worker mother cared for her, provided her clean clothes, and cooked her meals. However, the social worker documented repeated instances of health hazards in the home. In January 2019, the court declared the children dependents, and removed them from their parents' custody. The three children were placed with the same foster family. The court ordered reunification services for the parents and monitored visitation. Mother appealed—the first of three overall appeals in these proceedings—and we affirmed the court's orders. (See *In re M.R.* (Sept. 27, 2019, B295466) [nonpub. opn.].)

In September 2019, the juvenile court held a six-month review hearing. DCFS reported the parents had had "sporadic visitation with the children," however, mother called daughter every day, and daughter, now eight years old, said she wanted to return to mother's care. The court ordered DCFS to provide additional reunification services.

For the next six months, mother proceeded to consistently attend weekly visits with the children and call them daily. In March 2020, mother stopped in-person visits due to concerns about COVID-19. Mother maintained daily contact with the children by either phone or video chat." In August 2020, DCFS reported that daughter was building "a healthy appropriate relationship with foster mother," but still missed mother and wanted to return to her care. Foster mother monitored the children's calls with mother and "reported no major concerns with mother." Mother "did her best to try to engage with the children

but it was challenging at times to maintain" the attention of the now five-year-old and one-year-old.

In October 2020, the court held a review hearing, and terminated reunification services. The juvenile court set a "permanency planning review hearing" under Welfare and Institutions Code section 366.26. Over the months leading up to the section 366.26 hearing, mother continued to call or video chat with the children daily. During these visits or calls, mother "focuse[d] more on" daughter than the younger children, and "mainly" spoke to daughter as the five-year-old was "unable to stay on the phone." Mother was "appropriate during video or telephone calls, as she ask[ed] the children about their day and ma[de] conversation about what she does at home."

DCFS recommended termination of parental rights and adoption by the children's foster parents who had expressed a willingness to adopt. While daughter reported feeling "happy and safe in the home" of her caregivers, she continued to express a desire to return to her mother's care. In February 2021, the court held a selection and implementation hearing. At the hearing, mother's counsel asked the court to order a bonding study and hold a contested hearing "under the parental bond exception." Minor's counsel, who represented all three children, argued only, "I would oppose setting this for a contest on the parental bond exception and point out that although mother had had regular visits, she hasn't had a parental role with the children, which would be required to sustain the parental bond exception." The court agreed on the ground, "Mere visitation with the children is not enough to trigger the parental bond exception."

Neither counsel nor the court addressed the children's individual relationships with mother or any specific facts in the

4

record. The juvenile court concluded generally that mother could not establish an exception to the termination of parental rights as to any of her children, terminated parental rights, and ordered adoption as the permanent plan. Mother appealed.

On October 28, 2021, we reversed termination of parental rights, concluding the juvenile court abused its discretion in denying mother's request for a bonding study. (See *In re M.V.* (2023) 87 Cal.App.5th 1155, 1179 ["Bonding studies supply expert opinion about the psychological importance to the child of the relationship with his or her parent(s) to assist the court in determining whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)"].)

## 2.     *Bonding Study*

Following remand, on January 13, 2022, DCFS (not mother) requested the juvenile court order a bonding study. On January 20, 2022, the juvenile court appointed Dr. Gerardo Canul, a licensed psychologist and evaluator, to conduct the bonding study addressing the "parent-child bond, if any, and the impact of severing the parent-child relationship, if any."

On April 1, 2022, Dr. Canul interviewed mother, and on April 16, 2022, he observed daughter and mother together during a regular visit. Dr. Canul found their interactions were positive and they appeared comfortable with each other. Daughter "appeared to be calm and interested in socializing/visiting with" mother, and was "happy to see her mother and seek warmth from the mother." During the visit, daughter followed directives and redirection from mother.

Dr. Canul stated mother's "interpersonal skills in particular with [daughter] were mostly appropriate yet, appeared subdued and with a mildly flat affect." Dr. Canul said there was

5

"evidence to indicate the presence of a moderately positive emotional interdependence between [daughter] and the mother that has been developing."

Dr. Canul also observed that daughter tried to engage mother through questions, like asking "what is my favorite color" and multiplication math problems. Although interested, mother could not answer the questions and was unable to "verbally reciprocate in a manner that the minor found satisfactory."[3]

Dr. Canul reported: "The minor and the mother's relationship [is] interactive and/or moderately reciprocal in a positive manner. The mother has a low-average awareness of the minor's overall psychological, developmental, and emotional needs. I believe[] that the mother is sincere in professing her 'love' for [daughter]. [¶] The nature and quality of their relationship is moderately strong. [¶] In order for the child to more fully develop physically, socially, and psychologically the minor will need to live in a stable and consistent home and [sic.] caregiver(s)."

In a supplemental statement dated June 23, 2022, Dr. Canul wrote, "I am providing the following supplemental statement. The [daughter] being adopted outweighs the detriment she may experience from discontinuing contact with her biological mother through in-person visits and phone calls."

### 3. *Visitation with Mother*

While the initial order terminating parental rights was on appeal, mother remained in contact with daughter. Following

---

[3] In October 2019 the court had ordered a psychological evaluation of mother; the ensuing report (not from Dr. Canul) indicated mother had low-average intellectual functioning range, and general, but not severe, intellectual limitations.

6

remand and up until the October 2022 section 366.26 hearing, mother had consistent visitation on Saturdays and Sundays with daughter for a total of six hours per week, monitored by daughter's caregiver. Mother and daughter also talked regularly on the phone. Although daughter initially described the visits as good overall, daughter often became bored, and mother typically relied on a computer tablet to entertain her. Daughter was regularly frustrated by mother's repetitive questions about daily life and well-worn stories. Daughter felt that mother did not have anything to talk about and acted "like a 7 year old." Because mother was nonresponsive to daughter's questions about what mother did with her time outside of visitation, daughter sensed that mother did not trust her. The caregiver, who monitored the visits, also reported that mother asked daughter repetitive questions about her daily life and school, and had difficulty engaging with daughter. The caregiver described the mother's conversations with daughter as "limited."

Daughter expressed that the back-to-back weekend visits with mother took up time from other things she wanted to do, like summer camp. In June 2022, daughter refused to talk to mother on the phone, declining mother's phone calls and not initiating calls. By September, daughter resumed telephone contact with mother.

Neither daughter nor mother expressed affection in a physical manner toward each other. They did not hug, kiss, or tell each other they cared for one another. Mother sometimes played with daughter's hair as a sign of affection, but that was rare. During visits, daughter did not sit next to mother because there were several instances where insects came out of items that mother carried. On one occasion in September 2022, roaches

came out of a bottle of hand sanitizer that mother had brought daughter. At another visit a few weeks before that, roaches were seen coming from mother's belongings.

### 4. *Daughter's Feelings About Adoption*

Daughter understood that her caregivers (who had cared for her since December 2018) wanted to adopt her and cut her ties with her biological parents. The caregivers, who were in the process of adopting daughter's younger brothers, did not want to be daughter's guardians. If daughter was not adopted by the caregivers, she would likely lose contact with her brothers.

Daughter was 10 years old in April 2022, when the social worker asked daughter how she felt about adoption. Daughter stated she was not opposed to it and that she did not want to be separated from her brothers because she would miss them. Daughter expressed that she loved her parents, would not like to lose contact with them, and would be "sad" not seeing the parents anymore, "but then said, 'Whatever.' " Recalling "all of the roaches, bugs and rats," daughter stated that she feared mother's home. Daughter was unsure what outcome she desired because she "want[ed] to maintain a relationship with all of her family."

In May 2022, daughter "presented as serious and responded with short answers" when asked about adoption. Daughter said she was "aware of what adoption is," and "is okay with [the prospective adoptive parents] adopting her." However, she did not want to change her last name to that of her caregivers. Daughter felt the prospective adoptive parents treated her well, and she liked playing with their daughter. Daughter stated she would "not feel anything" if she stopped visiting mother.

In June 2022, daughter "appeared to be saddened by the conversation" about adoption, and said she "wants to be adopted by" her current caregivers.  Daughter added that she felt "more worried about losing contact with her brothers than keeping connected to her biological parents."  Also in June, daughter's therapist of two months, who had had nine sessions with daughter, attested that she explained to daughter and daughter understood "that following adoption, she will no longer have visits with her biological mother."

When asked about adoption in September 2022, daughter continued to want to have contact with mother, but if she could not return to mother, she desired to stay with her current caregivers.  Then, "in a jovial tone," daughter told the social worker, " 'I will protest if you take me from here,' " meaning her caregivers' home.  Daughter reiterated that if she had to choose between mother and her younger siblings, she would choose her younger siblings and lose connection with her biological parents.

In October 2022, just before the section 366.26 hearing, daughter reiterated her desire to be adopted so she could be with her younger siblings.  She "wanted to stay connected to her younger siblings more than she wants to stay in contact with her parents."  Daughter explained that she " 'treasures the relationships with her siblings more than the biological parents.' "  Daughter also still felt some fear when recalling the home she lived in with her biological parents and her "constant worry that bugs would crawl in her mouth or ears."

DCFS assessed that, although mother had consistent visitation, the quality of visits had not improved.  Mother had been unable to establish a strong emotional bond with daughter

because "mother is not able to have a conversation with [daughter] in which mother can follow from start to finish."

### 5.     *The Section 366.36 Hearing*

On October 31, 2022, the juvenile court held the contested section 366.26 hearing, and received into evidence DCFS's reports, which included the information summarized above and the bonding study.

Mother's counsel argued for application of the parental-benefit exception to adoption, codified at section 366.26, subdivision (c)(1)(B)(i).  Counsel cited the contents of the bonding study as evidence of a strong child-parent bond.  Counsel also pointed out that the bonding study discussed issues regarding mother's ability to care for daughter, which were not relevant to the parent-child bond per *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

Mother's counsel highlighted daughter's statements that she did not want to change her last name or lose connection with mother as evidence of a strong parent-child relationship.  Counsel argued that the caregivers and DCFS placed daughter under immense pressure to select adoption as her preferred permanent plan.

Daughter's counsel argued that since remand from mother's appeal of the first termination of parental rights, the record consistently documented statements from daughter that she wanted adoption and was aware of its ramifications on her relationship with mother.  Daughter's counsel pointed out that although mother and daughter had maintained a relationship, it had been limited by mother's inability to interact with daughter beyond repetitious questions.  Counsel also asserted that the

10

analysis of the parental-benefit exception should focus on daughter's stated wishes to be adopted.

DCFS joined in daughter's counsel's arguments. DCFS conceded mother had regular, consistent visitation, but highlighted that daughter was bored and they were not affectionate at visits. DCFS asserted the benefit of remaining with the caregivers, who daughter and her siblings had been with for four years, outweighed the benefit of maintaining a relationship with mother. DCFS stated that daughter understood how adoption would impact her relationship with mother, yet still wanted to go forward with adoption.

The court found that mother had not demonstrated the necessary factors to establish the parental-benefit exception under *Caden C.* The juvenile court declined to apply the exception, terminated parental rights, and identified adoption as daughter's permanent plan. In its minute order, the court stated: "The Court finds that the parent has not maintained regular visitation with the child and has not established a bond with the child. [¶] The Court finds that any benefit accruing to the child from his/her relationship with the parent(s) is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in the best interests of the child."

### DISCUSSION

The parents argue the court erred when it found the parental-benefit exception did not apply. They contend the bonding study was inadequate and thus the juvenile court lacked substantial evidence to terminate parental rights.

## 1.    *The Parental-Benefit Exception*

The goal of section 366.26 proceedings is "to provide stable, permanent homes" for dependent children.  (§ 366.26, subd. (b).)  In cases where the juvenile court terminates reunification services, adoption is the Legislature's preferred permanent plan for the child.  (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53.)  If the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the section 366.26 exceptions to adoption.  (*In re Celine R.*, at p. 53; see also § 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at p. 625.)

Under the parental-benefit exception to adoption, the parent must "establish, by a preponderance of the evidence," "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629, 631.)  "What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Ibid.*)

The first element is straightforward.  For the second element, "the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [C]ourts often consider how children feel about, interact with, look to, or talk

12

about their parents." (*Caden C., supra,* 11 Cal.5th at p. 632.) As to the last element, "[w]hat courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

When assessing whether the parental-benefit exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Essentially, "the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at p. 631.)

We review the juvenile court's findings on the first two elements — visitation and the existence of a beneficial parent-child relationship — for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 639.) We review for abuse of discretion the court's assessment whether termination of parental rights would be detrimental to the child. (*Id.* at p. 640.)

## 2. *The Court Did Not Err When It Denied the Parental-Benefit Exception*

Although the juvenile court found insufficient proof of regular visitation, at the hearing, mother's counsel, daughter's

13

counsel, and DCFS all agreed that mother satisfied this element. We also assume, without deciding, that mother satisfied the second element, i.e., that daughter would benefit from continuing her relationship with mother. Daughter had spent the first seven years of her life with mother, sought warmth from mother, was interested in socializing with mother, and was happy to see mother. Their relationship was "moderately strong" and "interactive and/or moderately reciprocal in a positive manner."

That said, we conclude the juvenile court did not abuse its discretion when it assessed that the benefit of daughter's relationship with mother was outweighed by the physical and emotional benefit daughter would receive through the permanency and stability of adoption. By the time of the second section 366.26 hearing, daughter was 11 years old and had repeatedly stated she wanted to be adopted by her caregivers, even if that meant losing her connection with mother. Understanding that adoption would keep her in the same household as her brothers, daughter consistently chose adoption, explaining that she " 'treasures the relationships with her siblings more than the biological parents.' "

In the months leading up to the section 366.26 hearing, daughter expressed annoyance with the tedium of mother's visits and her difficulty connecting with mother. Mother could not answer daughter's questions in a satisfactory and reciprocal manner. Because mother was minimally responsive to daughter's questions about aspects of mother's life, daughter also felt mother did not trust her. The bonding study opined that "mother has a low-average awareness of the minor's overall psychological, developmental, and emotional needs."

Although daughter received some benefit from a relationship with mother, the record indicates the relationship was not crucial to daughter's happiness. Daughter in fact desired fewer visits with mother because they interfered with other things she wanted to do. Daughter told the social worker that she would "not feel anything" if visits stopped. [¶ deleted.] Accordingly, the record supports the juvenile court's conclusion that daughter's attachment to mother was not significant enough to overcome the security and the sense of belonging adoption would confer on daughter. Simply put, the trial court did not abuse its discretion when it found that severing the child's relationship with the parent would not be so detrimental as to outweigh the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.)

Citing *In re M.G.* (2022) 80 Cal.App.5th 836 (*M.G.*), mother argues the bonding study inappropriately focused on mother's perceived ability to meet daughter's needs, and did not sufficiently address daughter's emotional attachment to mother. She asserts the juvenile court erred by relying on the study.

In *M.G.*, Division Eight of this district reversed an order terminating parental rights because the juvenile court relied on a bonding study that "offered minimal if any information about the nature of the child's relationship with his parents in the context of their developmental disabilities" and improperly compared "the parents' ability to manage [the child's] medical and developmental needs" to the caregiver's ability to meet the child's needs. (*M.G.*, *supra*, 80 Cal.App.5th at p. 851.) In *M.G.*, the bonding study was essential to assess the parent-child bond between the non-verbal and developmentally disabled three-year-old child and his developmentally disabled parents. (*Id.* at

15

p. 850.)  The appellate court reversed because the inadequate study was the principal evidence regarding the parent-child bond. (*Ibid*.)

Although the *M.G.* bonding study was conducted by the same psychologist as, and contains similar language to the bonding study here, *M.G.* is distinguishable.  Here, a great deal of evidence outside the bonding study conveyed the quality of mother's relationship with daughter.  The record contains observations from the caregiver and social workers about months of visitation and parent-child interactions.  Statements from daughter herself, indicating she wanted to be adopted, spoke volumes about the significance of the parent-child relationship.  Such evidence was unavailable in *M.G.*

We also observe that even though the bonding study expressed concerns about mother's ability to care for daughter, it also positively described aspects of the parent-child bond and was cited by mother's counsel in support the parental-benefit exception.  This was not a case of a trial court finding the adoptive parents would be better parents than the biological mother.

Lastly, mother asserts the juvenile court and the prospective adoptive parents placed daughter in "an impossible and unacceptable position" by having her choose between a relationship with mother or a home with her brothers and prospective adoptive parents.  The questions put to daughter apparently prompted some answers that perhaps generally compared the adoptive and biological parents, but the record disclosed that those answers represented daughter's feelings, not coercion by the adoptive parents.

## *DISPOSITION*

The order terminating parental rights is affirmed.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


KIM, J.

17